**B & B CORPORATION, Plaintiff,**

v.

**S & T INDUSTRIES, INC. and Clyde Sportswear, Ltd., Defendants.**

No. 86 Civ. 1657 (BN).

United States District Court,
S.D. New York.

June 7, 1988.

Schwartz & Schlacter, Jed R. Schlacter, New York City, for plaintiff.

Wendy, Adler & Klein, Herbert Adler and Philip E. Klein, New York City, for defendants.

## OPINION, FINDINGS OF FACT AND CONCLUSIONS OF LAW

NEWMAN, Senior Judge of the United States Court of International Trade, sitting by designation:

## INTRODUCTION

In this diversity action, plaintiff B & B Corporation, a ladies garment contractor located in Florida, sues to recover $49,011.83 representing the unpaid balance claimed to be due for its services in producing certain wearing apparel for defendant S & T Industries, Inc., a ladies garment manufacturer located in New York.[1] Additionally, plaintiff seeks an award of its attorney's fees pursuant to Federal Rule of Civil Procedure 11 and the equitable powers of the court. Defendant counterclaims seeking $628,295.63 as compensatory damages alleging a breach of contract and negligence by plaintiff arising out of various manufacturing defects, shortages, late deliveries and certain excessive charges by plaintiff.

Defendant concedes it has not paid the balance of $49,011.83 claimed by plaintiff to be due for its services, and therefore the issues presented in this case relate essentially to the constituent items of the damages asserted by defendant's counterclaim. As somewhat aptly expressed by defendant's counsel, "the defendant in this case is essentially the plaintiff" (Tr. 18).

The court conducted a five day bench trial at which plaintiff presented the testimony of one witness and defendant presented the testimony of six witnesses. The parties also introduced in evidence numerous documentary exhibits. After careful consideration of the credibility of the witnesses and based upon all the evidence and proceedings had herein, and the following findings of fact and conclusions of law, judgment will be entered for plaintiff in the net amount of $34,391.62, plus interest and costs, as set forth *infra.*

## BACKGROUND

Plaintiff is engaged in the cutting of textile piece goods supplied by its customers (garment manufacturers) and through subcontractors sews piece goods and trimmings[2] into finished garments. These garments are delivered to plaintiff's customers (such as defendant) who in turn sell them to retail stores. In 1986 plaintiff's volume of business was between $10,000,000 and $15,000,000.

Defendant purchases uncut piece goods, trimmings and other materials and employs contractors (such as plaintiff) to do cutting, sewing and trimming, thus converting the materials into finished ready-to-sell garments. Defendant sells its apparel to major department stores and specialty stores. In 1986 defendant had gross sales of approximately $40,000,000.

In the spring of 1985 plaintiff and defendant entered into an oral agreement in Florida through their respective principal owners, Gary Braverman and Richard Trontz, then close social friends. The parties agreed to a business arrangement in which defendant would purchase and ship to plaintiff all of the piece goods, trimmings and other items required to produce finished garments and plaintiff would have the materials cut, sewn and finished into ready-to-sell jackets and skirts of different fabrics and styles for delivery to defendant. Braverman informed Trontz that plaintiff had various assembly subcontractors in the Caribbean Basin; Trontz had no

---

1. Defendant Clyde Sportwear, Ltd. was formerly a subsidiary of S & T Industries, Inc. and at the time of trial was merely a division of S & T. For purposes of this action, the parties agree that the two defendant corporations may be regarded as a single entity (Tr. 2–3, 12, Pretrial Order at AF–2).

2. The term "trimmings" includes: buttons, zippers, belts, seam bindings, shoulder pads, hangers, poly bags and anything else used to produce the garments other than the fabric (Tr. 177, Pretrial Order AF–3).

objection to this subcontracting arrangement. On the basis of samples of prototype garments to be produced by plaintiff, the parties agreed on a price for labor and services of $4.00 for the jacket and $2.55 for the skirt, but these prices were later renegotiated and are not in dispute.

Although the testimony of Braverman and Trontz concerning the delivery schedule is sharply conflicting, the court finds Trontz' version in that aspect of the parties' agreement more credible. Thus, defendant agreed to deliver to plaintiff piece goods, trimmings and other necessary materials commencing in May 1985 and running to August 1985 for the production by plaintiff of approximately 340,000 to 350,-000 garments to be delivered to defendant's showroom in New York in accordance with the following schedule (based on an eight week lead time): 40,000 to 50,000 units in August 1985; and 100,000 units in each of the months of September, October and November 1985—the contract to be completed in November 1985 (Tr. 171–174, 368).

Pursuant to its agreement with plaintiff, defendant purchased approximately 450,-000 yards of fabric in late May 1985 and commenced shipping to plaintiff's facility in Hialeah, Florida the stipulated piece goods, trimmings and other materials; defendant continued shipping to plaintiff these items during June, July and August 1985 (Tr. 131–133, 334). From late May through the first of July 1985 defendant had shipped to plaintiff sufficient materials to deliver 50,-000 garments in August 1985 and 100,000 garments in September 1985 (Tr. 174). In early August 1985 plaintiff commenced production of the garments and began issuing invoices to defendant. On September 6, 1985 plaintiff began delivering finished garments to defendant. Plaintiff never once complained to defendant that the production of garments was delayed or behind schedule for lack of sufficient fabric (Tr. 361).

It appears that Braverman and Trontz, desirous of maintaining their friendship, avoided personal involvement in the specific details for implementing the production program. Accordingly, after Braverman and Trontz agreed upon a general outline for the program, the two principals left the details of the agreement to be worked out by their respective staffs. The primary staff members of plaintiff who participated in implementing the program were: Jack Baum, production manager; Jack Dibner, a production person; and another production employee identified merely as "Julio." None of these individuals, who were actively involved in the program, testified at trial and Braverman was plaintiff's sole witness. Defendant's principal staff people directly involved in the program were: Myron Golin, production manager; Leon Shrank, production manager; Jack Grossman, production troubleshooter; Jack Grubman, quality control; Leonard Litoff, production troubleshooter; and Hyman Ginsberg, comptroller. Trontz and all of the foregoing individuals except Litoff testified on behalf of defendant.

Plaintiff had connections with a number of sewing factories in Costa Rica and other locations in the Caribbean Basin with which it subcontracted for the production of finished garments. Thus, plaintiff utilized subcontractors in Costa Rica and El Salvador for the production of defendant's garments. As previously mentioned, Trontz was fully aware of plaintiff's subcontracting arrangements in the Caribbean Basin, and indeed, it was largely plaintiff's Caribbean Basin sewing factory connections that motivated Trontz to do business with Braverman.

After receiving piece goods from defendant, plaintiff cut the fabric at its facilities in Florida and shipped it along with the trimmings and other materials also received from defendant to the sewing factories in Costa Rica and El Salvador. Plaintiff's principal subcontractor in Costa Rica was Keschida and the sole subcontractor in El Salvador was Geesan.

Throughout the production program, defendant sent its quality control personnel to the sewing factories to instruct the workers how to sew the garments and to monitor the production and quality of the goods. These personnel (primarily Gross-

man and Grubman) played a substantial role in monitoring the quality of defendant's goods and their production, notwithstanding that quality control and production were the plaintiff's primary responsibilities.

Grossman made many trips to Costa Rica and El Salvador to visit the factories. He met several times with Keschida's owner, Ricardo Kellerman, after having been introduced to him by Dibner, and advised Kellerman that his factory had insufficient production capacity for the program. Kellerman informed Grossman that Keschida would subcontract with other nearby factories in Costa Rica for the production that Keschida could not handle (Tr. 512–513, 532). While Grossman pressed Kellerman to install more sewing machines and presses, Grossman made no objection to Kellerman's subcontracting arrangements with other sewing factories, and in fact Kellerman took Grossman to visit the other subcontractors (Tr. 511–513, 523, 532, 562, 612–614). Grossman kept Trontz fully informed as to Keschida's subcontracting arrangements in Costa Rica (Tr. 515, 612–613, 615–616). Moreover, and significantly, even after Keschida's production for plaintiff terminated, defendant independently continued to directly contract with Keschida for producing garments and Keschida continued its subcontracting arrangements with other sewing factories in Costa Rica (Tr. 611).

In addition to Grossman, who as previously mentioned made many trips to Costa Rica and El Salvador to monitor quality and production, defendant also sent Grubman and other quality control personnel to the sewing factories to instruct the personnel and closely monitor the quality of the goods and their production. Kellerman also took Grubman to Keschida's subcontractors in Costa Rica (Tr. 786–787, 803).

In sum, the stipulated facts in the Pretrial Order (AF–3) and the evidence of record clearly show that defendant's personnel closely monitored the quality of defendant's garments and their production in the sewing factory subcontractors in Costa Rica and El Salvador on virtually a continuous basis. Further, there can be no doubt that both Grossman and Grubman were fully informed by Kellerman concerning Keschida's subcontracting arrangements with other factories in Costa Rica and that these arrangements were reported by Grossman and Grubman to Trontz (Tr. 190, 512–515, 523, 532, 562, 612–616).[3]

Despite defendant's diligent and comprehensive quality control at the sewing factories,[4] it appears that some of the garments plaintiff delivered to defendant bore the mark of poor workmanship. Hence, Golin testified that from the very beginning of deliveries in early September 1985 he found that a substantial number of the garments arriving at defendant's warehouse had: poor button placement, wavy stitching of waistbands, improper pressing which produced shiny flannel, sagging skirt hems and uneven lapels on the jackets (Tr. 363–365). Golin related these problems to Baum by telephone and informed him that defendant would have the garments repressed in local shops in New York and charge back the expense to plaintiff (Tr. 364–368). Moreover, Golin testified that he informed Baum that certain garments were unsalable as first quality because they arrived with stains and holes (Tr. 377, 378).

Quality problems were also described by Shrank, who testified that from the time the garments first arrived at defendant's warehouse on September 6, 1985, he observed: dirt, shaded garments (made from different bolts of cloth), buttons that had the wrong color, buttons that did not cover

3. Trontz' testimony that Kellerman refused to disclose Keschida's subcontractors and that neither Trontz nor his staff were aware that Keschida had subcontracted the work out to other sewing factories (Tr. 208, 269, 276–279) is totally lacking in credibility, and candidly is astonishing in light of the flatly contradictory testimony on that score by defendant's witnesses Grossman and Grubman.

4. It appears that the close quality control at the factories by Litoff, Grossman and Grubman reached the point where Braverman complained to Trontz that defendant's people were "disrupting" the factories. Braverman asked Trontz to remove his personnel from the factories, but Trontz refused to remove them (Tr. 267–268).

the button marks, rust marks on skirts from corroded pins, hangtags improperly placed on garments, uneven bottoms on the skirts caused by improper stitching, incorrect sizes shown on labels, and skirts cut in such a manner that they had an improper fit (Tr. 642–645). Shrank called these defects to the attention of Baum and requested him to take the defective garments back to Florida for repairs. However, Baum refused to take the garments back stating that plaintiff did not have the facilities to repair garments (Tr. 646–647, 649, 675, 685–686). Shrank then informed Baum that defendant would have the repairs made in New York. No garments were ever returned by defendant to plaintiff for repair.

In addition to the various quality defects described by Golin and Shrank, plaintiff failed to comply with the delivery schedule required by the parties' contract. Although plaintiff agreed to deliver 40,000 to 50,000 garments in August 1985 and complete the deliveries in November 1985, deliveries commenced as late as September 6, 1985 [5] and extended to January 1986. Starting in September 1985 Golin complained to Baum about the late delivery problem (Tr. 374).

Because deliveries fell behind schedule, Golin requested Baum to ship the garments to defendant by airfreight (Tr. 418). Plaintiff billed defendant for the airfreight differential; defendant paid this differential to plaintiff and charged it back to plaintiff on credit bill No. 26101 (Tr. 377, 426, 864). In September or October 1985, Golin notified Baum by telephone that plaintiff would be charged back for the airfreight differential (Tr. 418).

Defendant also counterclaims against plaintiff for alleged shortages, calculated on the difference between defendant's record of the goods actually cut (as reported by plaintiff on cutting tickets) and the number of garments defendant received at its warehouse (as recorded first on receiving slips and then on tally sheets, Exh. L

(Tr. 380). Golin informed Baum of these shortages by phone calls (Tr. 451–452).

There is no dispute concerning the amounts invoiced by plaintiff or paid by defendant (Exh. 8). Hence, from August 9, 1985 through December 17, 1985, plaintiff invoiced defendant the sum of $1,067,-278.78. Additionally, from August 9, 1985 through December 17, 1985, plaintiff issued various credits against the $1,067,278.78 in the amount of $73,267.16 (covering price adjustments or defendant's direct payments to the sewing factories instead of to plaintiff), leaving a net amount due of $994,011.62. From September 11, 1985 through January 13, 1986 defendant paid plaintiff the total sum of $989,722.25, leaving a balance due of $4,289.37. Thereafter, on January 9, 1986, plaintiff issued its invoice No. 5535 to defendant for additional work in the sum of $44,363.75 (Exh. 4). Defendant sent plaintiff check No. 5308 dated January 16, 1986 in the sum of $44,-363.75 in full payment of the January 9, 1986 invoice. However, on January 29, 1986 plaintiff was informed by its bank that defendant had stopped payment on its check of January 16, 1986 (Exh. 6). Finally, on January 29, 1986 plaintiff issued its last invoice to defendant (No. 5557) in the sum of $16,906.71 for the production of 5,518 additional garments (Exh. 7). However, defendant refused to accept delivery of this shipment on January 29, 1986 (Tr. 431–432) and the garments were returned to plaintiff (Tr. 52, 893). Subsequently, on or about April 3, 1986 plaintiff sold these refused garments for $16,548.00 (Exh. 12, Tr. 60–61). In short, plaintiff claims that defendant owes a balance of $49,011.83 (Exh. 13).

On January 23, 1986 defendant sent plaintiff a letter together with twelve "credit bills" seeking payment of $672,-659.38 (Exh. 10, Tr. 52–57). These credit bills, which are discussed *infra*, seek compensation from plaintiff for various expenses and losses allegedly incurred by defendant (cost of repressing garments, air-

---

5. The first shipment, which arrived at defendant's warehouse on September 6, 1985, com-

prised merely 10,600 garments (Tr. 677).

freight differential, shortages, etc.). Subsequently, on January 30, 1986 defendant sent plaintiff a second letter (Exh. 11), which enclosed a "Statement of Account" and demanded payment from plaintiff in the sum of $628,295.63 ($672,659.38 less the stop payment check of $44,363.75).

## DISCUSSION

Plaintiff seeks recovery of funds due it under certain unpaid invoices (Nos. 5421, 5485, 5504, 5535 and 5557) totaling $65,559.83 for its services to defendant (Exh. 13). Inasmuch as plaintiff sold the garments covered by invoice No. 5557, dated January 29, 1986 (Exh. 7), which defendant refused to accept, the sale proceeds of $16,548.00 (Exh. 12) concededly must be credited to the sum due plaintiff on the unpaid invoices. Accordingly, plaintiff claims the net sum owing by defendant is $49,011.83 (Exh. 13, Tr. 946). It is not disputed that the above-mentioned invoices have not been paid by defendant.

Defendant's credit bills of January 23, 1986 (Exh. 10) for which it counterclaims total $672,659.38. However, defendant stopped payment on its check No. 5308 issued to plaintiff on January 16, 1986 in the amount of $44,363.75 for the January 9, 1986 delivery (Exh. 5). Consequently, defendant counterclaims for a net sum of $628,295.63. The issue to resolved in the instant case is what portions, if any, of defendant's credit bills should be awarded to defendant on its counterclaim.

Before addressing the specific credit bills, a few general observations must be made which cast serious doubt on the credibility of defendant's evidence concerning the extent of defendant's quality problems.

The record and stipulations of the parties establish that during the entire production phase of the program Grubman, Grossman and defendant's other quality control personnel made numerous visits to the sewing factories in Costa Rica and El Salvador and closely monitored the quality and production of the work. Moreover and importantly—as we have seen—when defendant's program with plaintiff was completed, defendant continued to work independently and directly with Keschida and its subcontractors (Tr. 611). Although Braverman vehemently objected to the presence of defendant's quality control personnel in his cutting and sewing factories (because defendant's personnel were "disrupting" the work) and insisted that Trontz remove his goods and personnel from the factories (Tr. 68–69, 104, 108, 194, 196, 261, 266–268), Trontz flatly refused. In point of fact, Trontz placated Braverman and implored him to continue with production (Tr. 200).

The record further shows that in those instances where defendant was entitled to credits they were readily granted by plaintiff, and defendant did not hesitate to deduct these credits from its payments even prior to receiving a credit memo from plaintiff (Exhs. 9, 14; Tr. 99–100, 118, 256–257, 259). The fact that defendant paid plaintiff in excess of $900,000.00 and claimed no credits until January 23, 1986 for the allegedly massive quality problems raises serious doubts respecting the credibility of defendant's witnesses as to the extent of the problems. In considering the credibility of defendant's claims concerning quality defects, the court also finds it highly significant that defendant, who received over 300,000 garments from plaintiff, was unable to produce at trial a single defective garment notwithstanding defendant claims that many thousands of garments were unshippable to its retail customers. If these garments were in fact sold by defendant, as asserted by Golin (Tr. 397–398), defendant's credit bills do not take into account the proceeds of such sales.

Finally, in considering defendant's credit bill charges for quality defects, the court also has noted that the bills were prepared by defendant's comptroller, Mr. Ginsberg, predicated solely upon some handwritten notes prepared by Shrank (Exh. 20; Tr. 219, 650). But Ginsberg frankly stated he never saw, and defendant did not offer at the trial, any backup documentation in the form of repair invoices, cancelled checks, or accounts payable records. Significantly, too, Ginsberg had no idea as to where many of the figures on the credit bills came from, except Shrank's notes; and more-

over, Ginsberg did not know whether the figures on the credit bills pertained to garments manufactured by plaintiff or to some of defendant's other contractors (Tr. 864, 865, 872–873, 876, 879, 881, 904, 906, 909). Insofar as Shrank's notes are unsubstantiated by any backup documentation, the court gives them no credibility.

The court now turns to a discussion of the specific credit bills underlying defendant's counterclaims.

## Cost of Repressing Garments (Credit Bill 26100)

■ Credit bill 26100 charges plaintiff for repressing 18,921 garments at a total cost of $21,648.00. Ginsberg testified that these garments were sent to various local pressing contractors in the New York area who billed defendant for their services (Tr. 820–821). Yet, no invoices from these contractors, cancelled checks or any accounts payable records were offered in evidence at the trial although defendant was granted ample opportunity—indeed, several opportunities, including an adjournment to the following day—to do so (Tr. 827, 834). Rather, the only documentation offered by defendant relating to the repressing charges in credit bill 26100 was an unsubstantiated *sui generis* summary or compilation of charges by pressing contractors (Exh. N for identification). However, on plaintiff's objection, exhibit N for identification was excluded from evidence on the basis of Ginsberg's candid admission that the proferred document was not a record kept in the ordinary course of defendant's business and that it was not the *regular* practice of the defendant to prepare a summary of pressing charges (Tr. 817, 825–827). Ginsberg further admitted that while he had the pressing contractor's invoices in his file, he was uncertain as to whether the charges listed on the summary came from these invoices (Tr. 821).

Finally, exhibit N for identification—the very basis for preparing credit bill 26100—was compiled by defendant at a point in

time when defendant was preparing to sue the plaintiff. Trontz knew as early as November 1985 that he was going to sue plaintiff (Tr. 300–301, 303). Thus, when defendant's credit bills and exhibit N for identification were compiled in early January 1986, litigation between the parties was imminent and these documents obviously were prepared by defendant for purposes of litigation. Under all the circumstances, then, exhibit N for identification was plainly inadmissible. *Paddack v. Dave Christensen, Inc.*, 745 F.2d 1254 (9th Cir.1984); *Gilmore v. Strescon Industries, Inc.*, 66 F.R.D. 146, *aff'd*, 521 F.2d 1398 (3rd Cir. 1975). Absent admissible or credible evidence to substantiate credit bill No. 26100, that portion of defendant's counterclaim is disallowed.

## Excess Costs Charged by B & B (Credit Bill No. 26101)

### 1.

### Airfreight differential

■ As noted above, at defendant's request plaintiff made certain deliveries of garments by airfreight rather than by boat and defendant was invoiced by plaintiff for the difference in freight charges [6] (Tr. 864, 917; Exh. 1, invoice Nos. 5423, 5425, 5445, 5446, 5459, 5463 and 5484). Admittedly, defendant paid these charges to plaintiff (Tr. 377, 426, 864). These payments for the airfreight differential were then charged back by defendant to plaintiff on credit bill No. 26101. Defendant's chargebacks for the airfreight differential in credit bill No. 26101 are predicated upon the precise amounts that plaintiff invoiced defendant and the pertinent invoice numbers, as enumerated above, are listed in the credit bill. Hence, there can be no question as to the amounts of these airfreight differentials.

As discussed *supra*, plaintiff failed to comply with the delivery schedule agreed upon by the parties: there were no deliveries whatsoever in August 1985 and the program was not completed until January 1986. Defendant's garments were sched-

6. There is no dispute that the prices agreed upon by the parties included the cost of shipping the garments (Tr. 89). The normal means of transportation from the sewing factories was by boat to West Palm Beach, Florida and then by truck to defendant's warehouse in New York (Tr. 38).

uled for shipment to its customers from September through December 1985 in accordance with orders received three to six months prior to the scheduled delivery to the customers (Tr. 198), and all of defendant's orders from its retail customers were potentially cancellable for late delivery (Tr. 201–202).

The record further establishes that the delay in shipments was not due to defendant's failure to deliver to plaintiff sufficient piece goods or other materials (Tr. 361, 630–632); that defendant requested plaintiff to ship by airfreight because deliveries of the garments were arriving late (Tr. 418); and that starting in September 1985 defendant complained to plaintiff about the late deliveries (Tr. 196, 211, 239, 242, 360–361, 374, 376). Indeed, Golin admonished Baum in September or October 1985 that defendant would charge back to plaintiff the airfreight differential costs (Tr. 376–377, 418).

Finally, it appears that notwithstanding the expedited airfreight deliveries, 100,000 to 125,000 garments were delivered to defendant late—some of which arrived in December 1985 and January 1986 (Tr. 190, 192, 216–217). Since defendant attempted to mitigate the effect of plaintiff's late deliveries by airfreight shipments, defendant properly charged back the airfreight differentials on credit bill No. 26101. Accordingly, defendant's counterclaim is sustained as to the airfreight differentials in credit bill No. 26101.

### 2.
### Buttons, Pads, and Other Trimmings

■ The cost of the items identified on credit bill No. 26101 as "Buttons," "Pads & Trim," and "Poly bags" and included in plaintiff's invoice Nos. 5386, 5425 and 5485 were properly charged back to plaintiff. The parties' stipulation and the evidence clearly show that defendant agreed to supply plaintiff with all piece goods, trimmings and markers, and that during the period from May or June 1985 through January 1986, defendant delivered to or for plaintiff the necessary piece goods and trimmings (Pretrial Order at AF–3, Tr. 25–26). Braverman readily admitted that under the par-

ties' agreement, plaintiff was not to purchase any materials (Tr. 25–26). Additionally, even when the sewing factories claimed that they had not received buttons from plaintiff, defendant obtained new buttons and sent them to plaintiff in Florida (Tr. 362).

In view of the foregoing facts, the court sees no basis for plaintiff's charges to defendant in invoice Nos. 5386, 5425 and 5485 for the buttons and other trimmings. Consequently, defendant's counterclaim is sustained regarding the foregoing items charged back to plaintiff in credit bill No. 26101.

### 3.
### Repressing in Florida

■ Plaintiff's invoice No. 5423 of November 11, 1985 includes a charge to defendant of $729.98 for repressing in Florida 4,294 garments. In credit bill No. 26101, defendant properly charged back that item to plaintiff inasmuch as the garments delivered to defendant were required to be in a pressed condition.

In summary, the court sustains defendant's counterclaim regarding all of the chargebacks listed in credit bill No. 26101, totaling $14,620.21.

### Buttons, Buttonholing and Pressing (Credit Bill 26102)

■ Credit bill No. 26102 is a chargeback to plaintiff of $1.85 per unit for buttons, buttonholing and pressing in connection with 4,122 units of style No. 2801. Defendant attempted to substantiate its total chargeback of $7,625.70 on credit bill No. 26102 through the testimony of Ginsberg. However, Ginsberg steadfastly responded in the negative when asked on cross-examination whether in preparing the credit bill he had seen a bill or invoice for $1.85 per unit from anyone or any invoices for the 4,122 units; Ginsberg candidly admitted that he had merely relied upon Shrank's handwritten notes (Exh. 20) and had no idea where these figures came from (Tr. 864–866).

The court finds that credit bill No. 26102 was not properly substantiated by either Ginsberg's testimony or Shrank's notes and

therefore that item of the defendant's counterclaim is disallowed.

*"Seconds" (Credit Bill No. 26103)*

■ Credit bill No. 26103 for $108,047.70 covers various styles and quantities of so-called "seconds" allegedly received by defendant from plaintiff. Ginsberg testified that in preparing the credit bill he saw no documentation establishing the validity of the dollar amounts shown on the credit bill (Tr. 871). Moreover, there is no evidence that the garments covered by the credit bill were those produced by plaintiff (Tr. 871–872). Finally, Ginsberg and Golin admitted that the garments covered by credit bill No. 26103 were sold after the credit bills were issued (Tr. 397–398, 871), and the parties stipulated that "if B & B received consideration for the sale of those garments, that the number should be something less than that [shown] on the charge-back" (Tr. 398–399). However, Ginsberg had no knowledge of what price was received by defendant on the sale of the so-called "seconds" (Tr. 871).

The court finds that credit bill No. 26103 was not properly substantiated by defendant and accordingly that portion of defendant's counterclaim is disallowed.

*Shortages (Credit Bill Nos. 26105, 26106 and 26099)*

■ On credit bill Nos. 26105, 26106 and 26099 defendant charged plaintiff a total of $168,280.47 for alleged shortages of 11,346 garments. These credit bills were predicated on exhibit L, which is comprised of "tally sheets" listing various styles, lots and units cut by plaintiff and other contractors. Exhibit L in turn was compiled from various records including cutting tickets sent to defendant by plaintiff confirming the number of units cut from particular lots (Tr. 345, 348). In the process of compiling exhibit L, Golin discovered that there were shortages of garments, the number of which defendant computed by determining the difference between the number of units cut by plaintiff and the number of units received by defendant, as shown by receiv-

ing slips. But as previously noted, defendant refused plaintiff's last shipment of 5,518 garments covered by invoice No. 5557 (Exh. 7) dated January 29, 1986, which shipment defendant failed to factor into the number of garments invoiced by plaintiff or received by defendant. Additionally, Golin conceded that exhibit L is incomplete in that it does not include tally sheets for all of the styles that plaintiff produced (*viz.*, 1651, 1700, 1701, 1800 and 1801); and more, certain tally sheets from which the shortages shown in the credit bills had been calculated were thrown out by defendant (Tr. 427–429). Defendant was also unable to produce at the trial the cutting tickets from which the figures on exhibit L were derived (Tr. 350) and there were some discrepancies in defendant's documented receiving count (Tr. 437–452).

Under the foregoing circumstances, the court is unable to accept at face value defendant's failed claim that there was a shortage of 11,346 garments. Equally fatal to defendant's shortage claim is the fact that defendant's credit bills for shortages were predicated on per unit selling prices for the various styles (Tr. 298–299), but defendant offered no price lists, sales invoices or customer orders establishing the validity of the per unit values as set forth in the credit bills.[7]

For the foregoing reasons, the court finds that defendant utterly failed to properly establish its shortage claim.

*Style No. 2656—Circle Skirt (Credit Bill 26107)*

■ Credit bill No. 26107 charges plaintiff $39,996.00 for correcting certain defects in the bottoms and hems of 13,332 units at a per unit value of $3.00. Ginsberg admitted that he never saw any back-up documentation for this credit bill other than Shrank's notes (Tr. 872–875, 901–902, 904–905, 925). The court finds that credit bill No. 26107 is unsubstantiated by either Ginsberg's testimony or Shrank's notes, and therefore that portion of defendant's counterclaim is disallowed.

**7.** Ginsberg admitted that he did not know whether defendant had orders for all of the garments produced by plaintiff (Tr. 896).

**894**

*Style No. 1658—Buckle Skirt (Credit Bill 26108)*

■ Credit bill 26108 charges plaintiff $17,817.30 for 13,198 garments with "Bad button placement" and garments "Badly hung on hangers" that needed to be repressed, rehung and bagged. Ginsberg had no knowledge as to where the per unit charge of $1.35 on the credit bill came from other than Shrank's notes and he saw no other record to substantiate that charge (Tr. 876, 925–926).

As neither Ginsberg's testimony nor Shrank's notes substantiate credit bill No. 26108 to the court's satisfaction, that portion of defendant's counterclaim is disallowed.

*Extra Labels Shipped to Plaintiff (Credit Bill 26109)*

■ Credit bill No. 26109 covers 62,000 "extra" labels shipped to plaintiff at a unit value, allegedly based on cost, of $9.50 per thousand labels for a total charge of $589.00. Even assuming that defendant proved that these labels were shipped to plaintiff, defendant did not establish any obligation by plaintiff to pay for these additional labels. In any event, Ginsberg admitted that he saw no records or documentation substantiating the cost of the labels or a unit value of $9.50 per thousand labels (Tr. 878, 926, 927). Since neither Ginsberg's testimony nor Shrank's notes substantiates to the court's satisfaction the charge on credit bill No. 26109, that portion of the defendant's counterclaim is disallowed.

*Unshippable Garments (Credit Bill 26110)*

■ Credit bill No. 26110 charges plaintiff for 5,442 "skirts cut badly," which were unshippable. A per unit charge of $17.00 is claimed in the bill for a total chargeback of $92,514.00. Ginsberg stated he was not certain, but he believed that the unit value of $17.00 represented the normal selling price of the garments to the stores. However, he saw no documentation to substantiate the charge other than Shrank's notes (Tr. 879, 906, 927). Moreover, Ginsberg had no knowledge of what became of these so-called "unshippable" garments (Tr. 879).

Trontz testified that irrespective of costs, his credit bill policy is to charge back to the contractor his selling price of the garments (Tr. 298–299). But defendant produced no sales invoices, price lists, catalogs, customer orders or any other appropriate documentation whatever to substantiate any of the per unit values which defendant predicated on selling prices.

Absent any credible substantiation of the figures shown on credit bill No. 26110 or evidence of what became of the "unshippable" garments, this portion of defendant's counterclaim is disallowed.

*No. 2771/Kenya (Credit Bill 26111)*

■ Credit bill No. 26111 charged plaintiff for repressing 13,898 garments received from plaintiff with "Bad Bottoms" at $1.00 per garment for a total charge of $13,898.00. However, as in the case of credit bill Nos. 26100, 26103, and 26108, defendant offered no invoices from pressing contractors or other records to substantiate these repressing charges. Additionally, credit bill No. 26111 asserts that defendant's customers returned these 13,898 garments because they had rust marks from pins, and the credit bill charges plaintiff an additional per unit value of $13.50 for a charge of $187,623.00. Thus, credit bill No. 26111 totals $201,521.00.

Ginsberg conceded that he did not know whether the figures on credit bill No. 26111 were accurate, as he saw no backup documentation and he merely retyped the figures submitted to him by Shrank (Tr. 880–881, 927). Further, Ginsberg admitted that he did not know whether these garments were actually returned to defendant (Tr. 860, 881, 928) and he had no knowledge of whether or not the garments were resold (Tr. 882).

According to Ginsberg, exhibit M represents credits issued by defendant to its retail store customers for returned garments (Tr. 838). Defendant had several contractors other than plaintiff that worked on the same style of garments (Tr. 280, 282–285), but importantly, Ginsberg

did not know whether or not the garments shown on the credit bill were plaintiff's garments (Tr. 841–842, 860–861). Significantly also, all of the store credits comprising exhibit M were issued by defendant *after* January 23, 1986, the date defendant sent its credit bills to plaintiff (Tr. 845).

In view of all the foregoing circumstances, the court finds that defendant failed to prove that the credits in exhibit M should be charged to plaintiff, and similarly failed to substantiate the per unit value and other figures in credit bill No. 26111. Therefore, that portion of defendant's counterclaim is disallowed.

*Plaintiff's Waiver and Estoppel Arguments*

■ Plaintiff postulates that defendant's acceptance of all shipments of garments until January 29, 1986 and payments to plaintiff for its services until January 16, 1986 without any complaints concerning quality defects, shortages, or late deliveries constitute a waiver or estoppel of defendant's counterclaims. In support of this argument, plaintiff relies upon: *G. & D. Poultry Farms, Inc. v. Long Island Butter & Egg Co.*, 33 A.D.2d 685, 306 N.Y.S.2d 243 (2d Dept.1969); *Bangor Clothing Co. v. Superior Sportswear Corp.*, 22 A.D.2d 864, 254 N.Y.S.2d 415 (1st Dept.1964), *aff'd* 16 N.Y.2d 1018, 265 N.Y.S.2d 901, 213 N.E.2d 312 (1965).

Plaintiff's reliance upon principles of waiver and estoppel, as applied by the New York courts in the above-cited cases, is misplaced in the current case. While clearly the acceptance of goods and payment therefor may under certain circumstances constitute a waiver of defects or an estoppel, these principles are inapplicable under the circumstances of this case.[8]

While the court cannot give credibility to much of their testimony, defendant's witnesses Trontz, Golin and Shrank testified convincingly and without contradiction that during the production program they orally complained numerous times to plaintiff's production manager, Baum, and occasionally to Braverman, concerning various quality defects, shortages and late deliveries (Tr. 196, 211–212, 310–311, 363–366, 406, 409, 452–453, 646–647, 674, 684–686, 688, 771–772, 775). Indeed, it appears that defendant's personnel informed Baum that there would be chargebacks (Tr. 363–367, 684, 688), and Shrank also requested Baum to take some of the goods back to Florida for repairs. However, plaintiff refused to make any repairs (Tr. 674–675).

Under the foregoing facts and circumstances, the principles of waiver and estoppel urged by plaintiff are plainly inapposite.

*Sanctions*

■ In its post-trial brief plaintiff requests, pursuant to Federal Rule of Civil Procedure 11 and the equitable powers of the court, that sanctions be imposed against defendant and Mr. Trontz personally in the form of an award of attorney's fees in the amount of $46,275.00. Briefly, plaintiff insists that defendant's counterclaim was interposed in bad faith to intimidate and harass plaintiff, is patently frivolous, and has caused unnecessary delay and needless increase in the cost of this lawsuit violative of Rule 11. In support of its position, plaintiff cites *Shokai Far East Ltd. v. Energy Conservations Systems, Inc.*, 628 F.Supp. 1462 (S.D.N.Y.1986).

The present situation is entirely unlike *Shokai* wherein Judge Sweet in dismissing a counterclaim awarded plaintiff counsel fees against a buyer. There, the court found that defendant's defenses had no basis in fact, were withdrawn just before trial commenced, and the need for a trial would have been obviated absent the unfounded allegations. Those circumstances are not present here. *See also Hudson v. Moore Business Forms, Inc.*, 827 F.2d 450 (9th Cir.1987) (Rule 11 sanctions held improper as to non-frivolous allegations of counterclaim, but proper as to frivolous claim for damages); *Kramer, Levin, Nessen, Kamin & Frankel v. Aronoff*, 638 F.Supp. 714 (S.D.N.Y.1986) (plaintiff's mo-

---

**8.** Since the oral agreement between the parties was a contract for services rather than for the sale of goods, the Uniform Commercial Code is not applicable. *Manes Organ. v. Standard Dyeing & Finishing Co.*, 472 F.Supp. 687 (S.D.N.Y. 1979).

tion for sanctions pursuant to Rule 11 was granted where defendant and his attorney acted in bad faith by alleging frivolous affirmative defenses and a meritless counterclaim); *In Re Atlantic Financial Management, Inc.,* 603 F.Supp. 135 (D.Mass.1985) (Rule 11 sanctions denied where dismissed counterclaims were not interposed without warrant); *Deutsch v. Health Ins. Plan of Greater New York,* 573 F.Supp. 1443 (S.D.N.Y.1983) (Rule 11 sanctions denied where dismissed counterclaim was not interposed maliciously or frivolously).

Plaintiff's request for sanctions is denied.

## CONCLUSION

Plaintiff's claim for $49,011.83, representing the total of certain unpaid invoices less the proceeds from the resale of refused garments (Exh. 13), is sustained. For the reasons expressed above, the court further finds that defendant's counterclaim for breach of contract should be sustained as to credit bill No. 26101 totaling $14,620.21, and consequently plaintiff's claim must be offset by that amount. Insofar as defendant failed to establish the other damages specified in the credit bills, its counterclaim is dismissed as to those damages. Accordingly, plaintiff is awarded a judgment in the net amount of $34,391.62 [9] plus interest and costs, as follows:

In conformance with New York's Civil Practice Law and Rules, §§ 5001, 5002, 5004 (McKinney's Consolidated Laws of New York Annotated, Book 7B, Supplementary Pamphlet 1988), plaintiff's request for prejudgment interest is granted on the net amount of $34,391.62 owing to plaintiff from January 29, 1986 to the date of judgment at the rate of 9 percentum per annum. Plaintiff shall also recover post-judgment interest pursuant to 28 U.S.C. § 1961.

Further, under Rule 54(d) of the Federal Rules of Civil Procedure the court directs that defendant shall bear all costs of this action authorized by local Rule 11 particularly since only a very small portion of defendant's substantial counterclaim is sustained.

The foregoing constitutes the court's findings of fact and conclusions of law in accordance with Federal Rule of Civil Procedure 52(a). The Clerk of the Court shall enter judgment consistent with this opinion pursuant to Rule 58.

---

9. While plaintiff's claim for $49,011.83 includes $172.80 for invoice No. 5485 (covering buttons for which plaintiff improperly charged defendant), a chargeback for invoice No. 5485 is also included in credit bill No. 26101, which offsets the improper charge of $172.80 included in plaintiff's claim. Hence, it is unnecessary to reduce plaintiff's claim for $49,011.83 by $172.80.