178 F.3d 78
 IBJ SCHRODER BANK & TRUST COMPANY, as Trustee, Plaintiff-Appellant,
v.
FAIRFIELD COMMUNITIES, INC., Defendant-Appellee,
Fairfield River Ridge, Inc.; Fairfield St. Croix, Inc.;
Keyclearco; Lehman Brothers, Inc.; Pacific Securities
Companies; Parker Hunter, Inc.; Yvonne B. Claytor; William
Claytor; Sigler & Co .; Stifel Nicholaus & Co., Inc., Defendants.
 No. 1042, Docket 98-9024.
 United States Court of Appeals, Second Circuit.
 Argued Jan. 13, 1999.
Decided May 6, 1999.
 
 Nancy Kilson, New York, N.Y. (Sheldon I. Hirshon, Scott A. Eggers, John Margiotta, Proskauer Rose LLP, on the brief), for Plaintiff-Appellant.
 Thomas F. Munno, New York, N.Y. (James E. Tolan, Catherine A. Duke, Mishell B. Kneeland, Dechert Price and Rhoads, on the brief), for Defendant-Appellee.
 Before: JACOBS and SOTOMAYOR, Circuit Judges, and SAND,* District Judge.
 JACOBS, Circuit Judge.
 IBJ Schroder Bank, Trustee for Noteholders of Fairfield Communities, Inc. ("Fairfield"), brought this action against Fairfield, alleging that Fairfield's prepayment of an obligation to the Noteholders was structured to evade the terms of an Indenture entered into by the parties and to shortchange the Noteholders. IBJ ("the Trustee") appeals from a judgment of the United States District Court for the Southern District of New York (Stanton, J.) granting summary judgment in favor of Fairfield and dismissing the complaint.
 
 
 1
 * As part of Fairfield's bankruptcy reorganization, it negotiated an exchange of previously issued Notes maturing in 1992 for new ones, collateralized with real estate, paying lower interest rates and maturing in 1997. Upon maturity, the Notes were to be paid either (i) in cash ("Option One") or (ii) with a mix of the collateral (i.e., the appraisal value of the remaining real estate and the proceeds of previous sales) and--under some circumstances--Fairfield securities ("Option Two").
 
 
 2
 The district court found that when the parties created the Indenture, they anticipated that the value of the collateral (the appraised value was then $22 million) would be more than enough to pay off the approximately $15 million in Notes. At the same time, they anticipated that Fairfield's stock, then trading at approximately $2 per share, would continue to trade in that range. See IBJ Schroder Bank & Trust Co. v. Fairfield Communities, Inc., No. 97-Civ. 4491, 1998 WL 191426, at * 1 (S.D.N.Y. Apr.22, 1998).
 
 
 3
 The parties were wrong on both scores. The value of the collateral real estate plummeted: the appraised value at the maturity date was $7.17 million (and later was sold for only $4.4 million). Meanwhile, Fairfield's stock value skyrocketed above $20 a share. See id.
 
 
 4
 Given this state of affairs, Fairfield apparently sought a way to avoid the expense of Option One's full cash payment as well as the potentially more expensive Option Two, which would require delivery of the collateral (and proceeds) and the appreciated Fairfield stock. See id. So, on the day before the maturity date, Fairfield wire transferred $7.9 million to the Trustee. And on the maturity date, Fairfield formally elected Option Two and tendered the real estate collateral. The total of (i) the appraised value of this collateral (slightly more than $7 million), (ii) the $7.9 million tendered the day before, and (iii) the insignificant proceeds of prior sales, amounted to the approximately $15 million due on the Notes. See id., 1998 WL 191426, at * 2.
 
 
 5
 Unfortunately for the Noteholders, the real estate was sold for much less than the appraised value, and the Noteholders ended up with $2.7 million less than was due on the Notes. See id.
 
 II
 
 6
 The Trustee refused to accept the $7.9 million prepayment on behalf of the Noteholders, saying it was tendered in a manner not authorized by the Indenture, and put the funds in a separate account. (As discussed below, the parties disagree on whether this action resulted in a waiver of the Trustee's claim that the payment was unauthorized.) Shortly after the maturity date, the Trustee commenced this action in New York County Supreme Court, seeking: (i) a declaration that Fairfield had defaulted on its obligations under the Indenture; (ii) an injunction requiring Fairfield to deliver all of the reserved securities to the Trustee or to make full cash payment; and (iii) a preliminary injunction requiring Fairfield to provide security for its alleged repayment obligations. In June 1997 Fairfield removed the case to federal district court.[1]
 
 
 7
 The district court concluded that the $7.9 million prepayment was effective, and granted summary judgment in favor of Fairfield. See id., 1998 WL 191426, at * 3. The court noted that no provision of the Indenture prohibited Fairfield from tendering these funds or the Trustee from accepting them, and pointed to several provisions of the Indenture that provide for fund transfers. See id. As discussed more fully below, the court placed decisive emphasis on Section 4.08 of the Indenture, a provision from the agreement's subordination section. After reviewing various provisions of the Indenture, the court concluded:
 
 
 8
 In view of the absence of any provision prohibiting the payment defendant attempted to make, and the evident availability of the trustee's accounts for reception of such amounts and their application to pay off the Notes, defendant has the better of the argument that the payment it devised, although somewhat unexpected, is acceptable under the Indenture. Thus, aside from the apt epithet "gimmick," plaintiff is left with the argument that it is aggrieved by a substantial underpayment on the Notes.
 
 
 9
 Id. The "substantial underpayment" on the Notes, the court concluded, was the result of the Indenture's use of the appraised value of the real estate in the payment formula and the subsequent sale of the real estate at significantly below that value. See id.
 
 
 10
 On appeal, the Trustee argues that the district court erroneously construed the Indenture, and asks that we reverse and remand for entry of summary judgment in favor of the Trustee, with a direction that the district court issue a permanent injunction requiring Fairfield to transfer certain securities to the Noteholders.
 
 
 11
 We conclude that the Indenture specified carefully crafted payment options for Fairfield; that the payments Fairfield made just before and upon maturity met the requirements of none of them; that the Indenture afforded no room for another, improvised payment formula; that Fairfield made an election to pay according to the formula for the delivery of collateral and Fairfield securities; and that the Trustee should therefore be granted partial summary judgment. We also conclude, however, that a $2 million cap set forth in Section 2.15(b) of the Indenture will limit any premium the Noteholders are to receive and that the case must be remanded to the district court for consideration in the first instance of the appropriateness of injunctive relief.
 
 III
 
 12
 Fairfield, which constructs and owns vacation properties to be sold as time shares, completed a Chapter 11 reorganization plan in 1992. As part of the plan, it exchanged notes it had issued in 1989 for notes with a lower interest rate to be repaid in 1997. That debt restructuring was accomplished by a detailed Indenture between Fairfield and the Trustee, the terms of which are at issue in this appeal. A feature of the Indenture was the use of real estate to secure the Notes.
 
 
 13
 A detailed review of the Indenture provisions relevant to the issues on appeal is unavoidable.
 
 A. The Accounts and Payment Options
 
 14
 The payments that the Indenture contemplates are specified in part by reference to the Account or Accounts in which they are deposited and from which they are to be drawn. The Indenture sets up four specified "Accounts" to serve limited and defined purposes, as set forth in the margin.[2]
 
 
 15
 Section 2.01(b) of the Indenture provides that, until the maturity date, payments of principal and accrued interest may be paid only from the Interest Payment Account and the Prepayment Account. When the Prepayment Account exceeds $1 million, the Trustee is to use the money to redeem the Notes on a pro rata basis. See § 15.02(e).
 
 
 16
 Article 5 governs partial and complete redemption of the Notes prior to maturity. It requires, inter alia, that Fairfield notify holders whose Notes are to be redeemed ten to thirty days beforehand, which is presumably why Fairfield does not contend that its $7.9 million prepayment amounted to a redemption.
 
 
 17
 The Indenture contains other requirements for payment upon maturity. In the event there is enough money in the Interest Payment and Prepayment Accounts to pay off the Notes, the payment is to be drawn from those sources. In the event funds in these accounts are insufficient, Section 2.01(b) gives Fairfield two options: (i) to pay the Notes (and interest) in full in cash ("Option One") or (ii) deliver the collateral real estate, the money in the Accounts, and (possibly) Fairfield securities ("Option Two").
 
 
 18
 Under Option Two, if the appraised value of the real estate collateral, when added to the money in the Accounts, falls short of the amount of principal and accrued interest due on the Notes at maturity, Fairfield is additionally required to transfer shares of its stock (the "Reserved Securities"), the number of shares to be determined by multiplying the total number of Reserved Securities (588,235) by the quotient of the shortfall (capped at $5 million) and $5 million (i.e., 588,235 X (capped shortfall/$5 million)). Thus, if the difference between the appraised value of the collateral (when added to the funds in the Accounts) on the one hand, and the amount due on the Notes on the other, exceeds $5 million, then Fairfield is to deliver all of the reserved securities. As discussed more fully below, however, the Indenture elsewhere caps any premium above principal and accrued interest at $2 million.
 
 B. Subordination Provision
 
 19
 The outcome-determinative conclusion of the district court was that Fairfield's pre-payment on the eve of the maturity date was authorized by Section 4.08(a) of the Indenture:
 
 
 20
 Nothing contained in this Article 4 or elsewhere in this Restated Indenture, or in any of the Notes, shall prevent (a) the Company from making payment of the principal of, premium, if any, or interest on the Notes, or from depositing with the Trustee or any paying agent moneys for such payments, not then contrary to the conditions described in Section 4.02....
 
 
 21
 This provision appears in the lengthy section of the Indenture--Article 4--that deals with subordination. It resembles a parallel provision in a model indenture book, see American Bar Foundation, Commentaries on Indentures 569-70 (1971). We conclude that this provision, read in context, implements arrangements for subordination in Article 4, and does not (as we explain infra ) supplement the detailed payment provisions set forth in Section 2.01(b).
 
 
 22
 The first three subsections of Article 4 provide that: (i) (aside from the Collateral and a few other inapplicable exceptions) the right of the Noteholders to be paid is subject to Article 4, see § 4.01; (ii) the Noteholders' right to payment is subordinated to the rights of the Senior Indebtedness in the event of a default, see § 4.02; and (iii) any payment made by Fairfield to the Noteholders notwithstanding an event of default would be held by the Noteholders' Trustee in trust for the Senior Indebtedness, see § 4.03.
 
 
 23
 This arrangement places the Trustee in some jeopardy of being required to refund to the Senior Indebtedness money that the Trustee had already disbursed to its Noteholders. That jeopardy is alleviated by Sections 4.04 and 4.12:
 
 
 24
 * Section 4.04 (para. 1) requires Fairfield to notify the Trustee of any event of default; allows the Trustee to assume that no event of default has occurred unless the Trustee is given notice by Fairfield or the Senior Indebtedness (and to rely on certain other indications such as court orders [para. 2] ); and (in para. 3) relieves the Trustee of the burden of a full range of fiduciary duties--such as one that might have required the Trustee to investigate whether an event of default had occurred before making payment to the Noteholders.
 
 
 25
 * Section 4.12 provides another safe harbor for the Trustee: unless the Trustee is given notice within the prior 24 hours that an event of default has occurred, the Trustee has "full power and authority to receive such moneys and to apply the same to the purpose for which they were received, and shall not be affected by any notice to the contrary which may be received by it on or after the commencement of such twenty-four-hour period."
 
 
 26
 These provisions are further implemented by Section 4.08(b), in which the Senior Indebtedness acknowledges--as between the senior and junior debt--that the Trustee may expend payments from Fairfield to the Noteholders unless more than 24 hours advance notice has been given, i.e., the Trustee has "knowledge within the meaning of Section 4.12 of a default."
 
 
 27
 Section 4.08(a)--on which the district court relied in giving effect to Fairfield's eve of maturity pre-payment--was set forth earlier and is repeated here for context:
 
 
 28
 Nothing contained in this Article 4 or elsewhere in this Restated Indenture, or in any of the Notes, shall prevent (a) the Company from making payment of the principal of, premium, if any, or interest on the Notes, or from depositing with the Trustee or any paying agent moneys for such payments, not then contrary to the conditions described in Section 4.02....
 
 
 29
 The district court relied in great measure on the dominant preamble of this subsection. But this subsection should be read in tandem with Section 4.06, which begins with the same preamble:
 
 
 30
 Nothing contained in this Article 4 or elsewhere in this Restated Indenture, or in the Notes, is intended to or shall alter or impair, as between the Company ... and the holders of the Notes, the obligation of the Company, which is subject to the limitations of Sections 2.01 and 2.16, to pay to the holders of the Notes the principal of, premium, if any, and interest on the Notes at the time and place and at the rate and in the currency or property therein prescribed, or to affect the relative rights of the holders of the Notes and creditors of the Company other than the holders of Senior Indebtedness, nor shall anything herein or therein prevent the Trustee or the holder of any Note from exercising all remedies otherwise permitted by applicable law upon default under this Restated Indenture, subject to the rights, if any, under this Article 4....
 
 
 31
 (emphasis added).
 
 
 32
 Sections 4.06 and 4.08(a)--read together--state a single, coherent proposition: Article 4 does not alter the nature or timing of Fairfield's obligation to make payments to the Trustee, or prevent Fairfield's compliance with its obligations to the Trustee, unless there is in fact a default. Therefore--in the absence of default--Fairfield is not prevented from making payments, see § 4 .08(a); but such payments must be in accord with obligations found elsewhere in the Indenture, see § 4.06 (cross-referencing §§ 2.01 & 2.16).
 
 IV
 
 33
 This analysis of the Indenture leads us to several conclusions. First, Section 4.08 does not afford Fairfield an opportunity to revise its obligations to the Noteholders. The reading of Article 4 as a whole, and Section 4.08 in particular, depends upon the understanding that Article 4 involves arrangements between certain classes of Fairfield's creditors and does not impair, increase or otherwise affect the obligations of Fairfield itself as elsewhere written. Second, the Accounts exist for limited and defined purposes, not to receive money drops from Fairfield. Third, there are carefully circumscribed pre-maturity payment options (Section 4.08 not being among them), and Fairfield's $7.9 million payment meets the requirements of none of them.
 
 
 34
 As a result, Fairfield failed to perform properly under Option Two upon maturity. We therefore conclude that Fairfield's actions just before and upon maturity violated the terms of the Indenture, and that the judgment of the district court must be reversed.
 
 V
 
 35
 The Trustee urges on appeal that this Court direct entry of summary judgment on its behalf. We have said that we can award summary judgment to a party on appeal if either (i) "the facts in the record adequately support the proper result" or (ii) "the record as a whole presents no genuine issue as to any material fact." See Chase Manhattan Bank, N.A. v. American Nat'l Bank & Trust Co., 93 F.3d 1064, 1072 (2d Cir.1996) (internal quotation marks and citations omitted). We conclude that it is appropriate for us to award (partial) summary judgment to the Trustee on the ground that Fairfield failed to perform its obligations on maturity consistent with its election of Option Two.
 
 
 36
 Fairfield's only argument against entry of summary judgment on appeal is its claim that the Trustee waived any objection to the $7.9 million payment by accepting it. The argument is baseless.
 
 
 37
 "Waiver requires the voluntary and intentional abandonment of a known right which, but for the waiver, would have been enforceable. Waiver may be established by affirmative conduct or by failure to act so as to evince an intent not to claim a purported advantage." General Motors Acceptance Corp. v. Clifton-Fine Central School Dist., 85 N.Y.2d 232, 236, 623 N.Y.S.2d 821, 823, 647 N.E.2d 1329 (1995) (internal citations omitted) (construing U.C.C.); B & B Corp. v. S & T Industries, Inc., 688 F.Supp. 884, 895 (S.D.N.Y.1988) (construing common law).
 
 
 38
 After receipt of the prepayment, the Trustee protested to Fairfield that the payment was improper; segregated the money in a special account (not the Noteholders' Accounts); declared that Fairfield was in default; and announced that the Trustee would initiate litigation. No right was waived.
 
 VI
 
 39
 The Trustee also seeks an order requiring the district court to hold any necessary proceedings for the purpose of issuing an injunction "requiring Fairfield to issue and deliver the Reserved Securities to the Trustee." We decline to issue such an order.
 
 
 40
 Fairfield has consistently argued that the Trustee sold the collateral real estate in a commercially unreasonable manner, and that the Trustee's claim for Reserved Securities (based on a formula that is sensitive to the sales price) is therefore overstated. Because there is an inadequate record on this question, we leave it to the district court to determine in the first instance (i) whether and how this claim by Fairfield bears upon the amount and type of relief owed the Trustee and (ii) the merits of Fairfield's argument.
 
 
 41
 We also decline to order the injunction the Trustee seeks because it may not be entitled to all the Reserved Securities. The relevant portion of the Indenture (with emphasis added) is set out here at length:
 
 
 42
 SECTION 2.15. Trustee's and Escrow Agent's Disposition of Collateral.
 
 
 43
 (a) If the ... Reserved Securities are delivered, assigned or transferred to the Trustee by the Company or Guarantors pursuant to Section 2.01(b) or pursuant to the terms of the Collateral Documents, the Collateral will be sold, transferred, liquidated or otherwise disposed of pursuant to Section 2.18 in a commercially reasonable manner and the Trustee will distribute such Reserved Securities pro rata to each Noteholder. Upon receipt of sufficient Net Cash Proceeds from such Collateral sales, when combined with the other available funds in the Accounts ... to pay fully the Maturity Principal Amount of all Notes outstanding on the Maturity Date plus accrued but unpaid interest on those Notes through the Maturity Date after application of the funds in the Accounts in accordance with Sections 15.02 and 15.03 or pursuant to the terms of the Collateral Documents, or upon receipt of the Net Cash Proceeds from all of the Collateral and distribution of the Reserved Securities, if any, the Trustee will use those Net Cash Proceeds plus any other available funds in the Accounts and the Reserved Securities, if any, to pay pro rata, without preference or priority of any kind, according to the amounts due and payable on such Notes on the Maturity Date to each Noteholder upon surrender and cancellation of the holder's Notes....
 
 
 44
 (b) If the Escrow Agent holds additional Assignment Documents governing additional Collateral or the Trustee holds or owns additional Reserved Securities, respectively, after application of Section 2.15(a), the Trustee will continue to sell, transfer, liquidate or dispose of those Reserved Securities in a commercially reasonable manner and the remainder of the Collateral will be disposed of pursuant to Section 2.18. Any Net Cash Proceeds from such transactions, plus any Net Cash Proceeds ... held by the Trustee and not applied in Section 2.15(a), up to an aggregate of $2,000,000 will be paid as a premium on the Notes pro rata, without preference or priority of any kind, according to the amounts due and payable on such Notes on the Maturity Date upon the surrender and cancellation of their Notes pursuant to this Section 2 .15. All remaining Net Cash Proceeds held or received by the Trustee in excess of the $2,000,000 premium and any remaining Collateral and Reserved Securities, if any, and any non-cash proceeds and cash equivalent proceeds received by this Trustee in respect of any Collateral or Reserved Securities, if any, will be delivered, assigned or transferred to the Company without recourse or warranty within 10 business days of the Trustee's receipt of the Net Cash Proceeds, which when added to all other sums of Net Cash proceeds held by the Trustee pursuant to this Section 2.15(b), exceeds such $2,000,000 premium.
 
 
 45
 The Trustee focuses on the last clause of the first sentence of Subsection 2.15(a), that all the Fairfield shares thereunder were to be "distribute[d] pro rata," and on that basis argues that this "cap" provision would not operate except in remote and barely conceivable contingencies not presented here. That phrase, however, appears in a prefatory sentence that characterizes the effect of the procedurally complex provisions that follow, provisions that very specifically say what the Trustee is to do with the shares when the Trustee gets them. Thus, the Indenture provides that the Trustee will use "net cash proceeds plus any other available funds in the Accounts and the Reserved Securities, if any, to pay [the Notes] pro rata ...." § 2.15(a). The cash proceeds of the shares--not the shares themselves--are to be used for these payments; we know that because the next provision (Subsection 2.15(b)) describes how funds for the premium would be generated by "continu[ing] to sell, transfer, liquidate or dispose of those Reserved Shares in a commercially reasonable manner ...." (emphasis added). Reserved Securities remaining after the payment of the maximum $2 million premium are then to be returned to Fairfield.
 
 
 46
 Subsection 2.15(a), sentence one, therefore cannot be read to mandate distribution to the Noteholders of all the shares without regard to the $2 million cap specified in Subsection 2.15(b), sentence two. The Trustee has cited no good reason why the $2 million cap does not limit the premium that the Noteholders may enjoy on maturity.
 
 CONCLUSION
 
 47
 For the foregoing reasons, we reverse the district court's summary judgment for Fairfield, direct entry of partial summary judgment for the Trustee, and remand for further proceedings consistent with this opinion.
 
 
 
 *
 The Honorable Leonard B. Sand of the United States District Court for the Southern District of New York, sitting by designation
 
 
 [1]
 Meanwhile, Fairfield filed a declaratory judgment action in the Bankruptcy Court in Arkansas, where its bankruptcy case was pending. That court stayed the action in favor of the New York litigation
 
 
 [2]
 The "Interest Payment Account" is to receive funds related to the collateral (partnership distributions and asset sales). See Art. I & § 15.02(a)
 The "Prepayment Account," is to be used for the redemption of Notes and is to receive transfers from the Interest Payment Account when its balance exceeded $1 million. See Art. I & § 15.02(c) & (d).
 The "Development Account" is to be used to develop real estate at one of Fairfield's properties. See Art. I & 15.03.
 The "Operating Account" is to be funded from property sales and to be used for maintaining one of the real estate developments. See Art. I & § 15.04.